IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 2, 2015


**STATE OF TENNESSEE v. KEVIN LADELL GRANDBERRY**

**Appeal from the Circuit Court for Fayette County**
**No. 13-CR-176    J. Weber McCraw, Judge**

_____


**No. W2014-01548-CCA-R3-CD  -  Filed September 15, 2015**

_____


The Defendant, Kevin Ladell Grandberry, appeals from his convictions for burglary, theft over $10,000, vandalism over $1,000, and felon in possession of a handgun.  He contends that the trial court abused its discretion in ordering the Defendant to be shackled during trial and that the evidence presented at trial was insufficient to support his convictions. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

George D. Norton, Jr., Selmer, Tennessee, for the appellant, Kevin Ladell Grandberry.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Mike Dunavant, District Attorney General; and Julie Pillow and Mark Davidson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual and Procedural Background**

In November 2013, the Fayette County Grand Jury indicted the Defendant for burglary, theft over $10,000, vandalism over $1,000, and felon in possession of a handgun.  In March 2014, in the weeks leading up to the Defendant's jury trial, the trial court entered an order in which it found that the Defendant posed a potential safety risk to those who may be in court during his trial.  The court ordered that additional safety

precautions should be taken to prevent any disruptions, "including, but not limited to, any shock devices to help secure and control the [D]efendant." Thereafter, the Defendant filed a motion requesting that he be allowed to wear plain clothes and appear unshackled during trial. After a hearing, the trial court granted the Defendant's motion as to his clothing but denied the Defendant's request that he be unshackled.

Following a jury trial conducted April 2-3, 2014, the Defendant was convicted as charged in his indictment. The trial court sentenced the Defendant, as a Range III career offender, to a total effective sentence of fifteen years' incarceration. The trial court then denied the Defendant's motion for new trial, and this timely appeal followed.

### *Pretrial Hearing*

At a pretrial hearing on the Defendant's motion to appear unshackled, Scott Miller, an employee with the Tennessee Department of Correction ("TDOC"), testified that the Defendant was a former inmate and had a history of disciplinary infractions of a violent nature. From the Defendant's disciplinary record, which was introduced as an exhibit, Mr. Miller reported that, in August 2008, the Defendant assaulted a female staff member, repeatedly punching her in the face and causing injuries to the officer. In March 2004, the Defendant assaulted another prison staff member, hitting the victim in the head and causing injury. Mr. Miller testified that the Defendant fought with other inmates on multiple occasions and "created a disturbance" five times while in TDOC custody. The Defendant also threatened to kill a TDOC employee and the employee's family. Mr. Miller stated that prison officials twice found the Defendant in possession of a deadly weapon—they found a nine-inch prison shank hidden in the Defendant's mattress in May 1999 and a seven-inch shank in August 1998.

Frances Turner, the jail administrator with the Fayette County Sheriff's Office, testified about several incident reports from the Defendant's time at the Fayette County Jail. On April 28, 2013, the Defendant assaulted a staff member who required medical treatment for injuries following the assault. Then, on February 10, 2014, the Defendant assaulted and injured another inmate.

Anthony Grandberry[1] testified that he was an inmate at the Fayette County Jail in 2012 and 2013, when he came into contact with the Defendant. Anthony explained that he was related to the Defendant "from my father's side" and that he and the Defendant talked on several occasions while in jail. The Defendant told Anthony that he was taking a bar off the wall in the bathroom of his cell and that he intended to use the bar in an

---

[1] Several of the witnesses share a surname. To avoid confusion, we will refer to these witnesses by first name. No disrespect is intended.

escape attempt. The Defendant said that he had loosened a bar in the bathroom and that he was going to use it to bust windows out of the pod and the control room. The Defendant told Anthony that he planned to "choke" or "harm" the staff member in the control room and he would assault any police officer that "got in the way." Once he had escaped from jail, the Defendant intended to hurt his sister, brother, and brother-in-law. Anthony later reported his conversation with the Defendant to John Sullivan, an agent with the Tennessee Bureau of Investigation ("TBI").

David Webb, an employee with the Fayette County Sheriff's Office, testified that he searched the Defendant's cell on March 27, 2014, while the Defendant was in court. Mr. Webb found that the Defendant had loosened a two-foot-long safety bar that was mounted on the wall next to the toilet in his cell. Mr. Webb explained that one screw had been completely removed from the bar and was lying on the floor. Another screw had been loosened and pulled out somewhat from the wall.

The State also entered into evidence a copy of a pending indictment out of Lauderdale County, in which the Defendant was charged with first degree premeditated murder, first degree felony murder, and other additional charges. The State also presented the trial court with certified copies of the Defendant's prior convictions, which included prior convictions out of Tipton and Haywood Counties for escape, aggravated assault, aggravated robbery, and simple assault.[2]

At the conclusion of the hearing, the trial court made the following findings:

> The Court listened to the testimony and now goes through the exhibits. Exhibit 1 was introduced by someone from the Department of Correction[], I believe, and in it, it has the disciplinary history of [the Defendant]. In that history, there is an assault on staff while [the Defendant] was incarcerated and [h]e became angry and assaulted some staff, punched her in the face with his fists. There's also other incidences of fighting, other incidences of assault on staff.
>
> There's also contained in the disciplinary file other incidences of possession of material that posed a security threat. There are numerous incidences of creating a disturbance and fighting while incarcerated. There

---

[2] The record reflects that the Defendant's Tipton County conviction for aggravated assault was based upon an incident in which the Defendant used two pieces of concrete tied in a cloth as a weapon and assaulted a guard in the Tipton County Jail. Additionally, the Defendant was convicted of aggravated assault in Haywood County for attempting to strike an officer with a vehicle.

is an incidence of [the Defendant], while in custody, being in possession of a deadly weapon, that being a nine-inch shank which was hidden under his mattress.

There is another incidence while in custody of being in possession of a deadly weapon, that being another homemade knife, about a seven-inch blade, consisting of two metal pieces that had been sharpened at the end and wrapped in some type of tape. There are other incidences of him threatening employees while incarcerated.

Further, in the exhibits[,] while being housed here in Fayette County[,] there is an assault on staff. There [are] fighting incidents. There is an incidence also while he was here in Fayette County in April where he attacked an officer while in custody. There is a disciplinary incidence while in Fayette County from August, 2013, where there is destruction and damage to property. There was failure to follow the rules and the orders and also charged with hindering an employee in his duties. Once again, [the Defendant] posed a threat and created a dangerous situation. In February 2014, there is an incidence with another inmate where he attacked an inmate and, again, there was a fight and he assaulted another inmate.

There is also in the exhibits that were admitted during the hearing where he has been indicted for first degree premeditated murder, felony murder, attempted first degree murder, employing a firearm in the commission of a felony. There is also as an exhibit judgment sheets where [the Defendant] was found guilty, in fact, pled guilty to an escape, to aggravated robbery, to an aggravated assault, again—and also an assault, again incidences of [the Defendant] being a violent person.

Also, there are contained judgment sheets from Haywood County Court where again [the Defendant] . . . pled guilty to an aggravated assault, to evading arrest. Again, those incidences where [the Defendant] has exhibited violent behavior, also behavior which indicates that he would be a flight risk.

Also, there was testimony during the hearing of someone who I believe was housed with [the Defendant], in fact, is, from what I recollect, a family member of [the Defendant], which indicated [the Defendant] indicated there would be problems at his trial, that he testified that [the Defendant] indicated that he would try to create a weapon from his cell,

- 4 -

which the Court finds that witness to be a credible witness, that [the Defendant] has verbalized that there would be problems during his trial.

After that testimony and after the hearing and it's been submitted today, the next exhibit which has a picture of the cell which, in fact, shows that a metal bar which is contained in the cell appears to be a couple of feet long, there's been an attempt to remove that. There are some screws removed from the wall, that testimony is it's been loosened. All of those are in furtherance of what the witness indicated that he would attempt to use a weapon, so, again, as to the credibility of that witness, it appears that a weapon was being contemplated by [the Defendant].

So, the Court, from all of those exhibits and the testimony, does find that [the Defendant] is a dangerous person, that he poses a threat during trial, that not only does he have this trial pending here, then he has an even more serious trial in Lauderdale County where he is charged with murder. Certainly, [the Defendant] would be motivated to continue to pose a risk pending the greater charges he has in other courts.

So this Court does find that [the Defendant] is to be considered a great danger certainly to the personnel and the Court but also to the jury. As configured in the courtroom, [the Defendant] would be in close proximity of the jury and even though the Court has certain security measures, including shock devices and beefed-up security, which all will be implemented, [the Defendant] still poses as a risk, that any quick, sudden movement by him could not be anticipated if all the security has been gathered in the courtroom.

The trial court concluded that in order to protect "all people in the courtroom, including the lawyers, particularly [the Defendant's] lawyer who he will be sitting next to, and to protect the jury, that even further restraints are needed." The trial court ordered that the Defendant be shackled and handcuffed during the trial, stating:

. . . The Court is going to order that the shackles not only be on his feet but he will also be handcuffed during the duration of the trial. The cuffs need to be situated so that his hands are also fastened to his waist so that he cannot use his hands or the cuffs as a weapon. All this appears to be supported by State of Tennessee v. [James Paul] Hurt, [No. M2006-02381-CCA-R3-CD, 2007 WL 4552987, at *3-4 (Tenn. Crim. App. Dec. 27, 2007)]which is a 2007 appellate case. The Court has looked to all other methods in order to protect all parties involved and they do not appear to be

adequate unless [the Defendant] has his hands confined so that he cannot use them as a weapon.

The trial court also instructed the sheriff's department to provide a cloth for the counsel tables so that the Defendant's restraints could not be noticed by the jury. The court concluded that "[s]hould somehow [the restraints] be noticed, the Court will give further instruction, but all efforts are to be made to make certain that the jury does not see that he is restrained."

## *Trial*

Christina Oaks testified that she was an employee at Bull Market in Somerville. On November 17, 2012, Ms. Oaks was scheduled to open the store at 6:00 a.m. Ms. Oaks testified, however, that she was running late that day and did not arrive at the market until about 6:25 a.m. When she pulled up, Ms. Oaks noticed what appeared to be garbage lying in the area of the store's drive-thru. Upon closer inspection, Ms. Oaks discovered that it was the cash register drawer from the store's lottery cash registers. She also noticed that the drive-thru window had been "busted out." Ms. Oaks testified that the window was about three and a half feet from the ground.

Ms. Oaks called the police and then called the owner of Bull Market. Ms. Oaks then noticed that, in addition to the broken drive-thru window, someone had attempted to break in the front door of the store. The glass door cracked but did not shatter because it was made of laminated glass and was shatterproof. When police arrived, Ms. Oaks accompanied the officer inside the store. Ms. Oaks noticed a piece of asphalt lying inside the store by the freezer that appeared to have been thrown through the drive-thru window. The cash register that usually sat next to the drive-thru window was missing, and the cash drawer from the store's Ruby register[3] had been taken. Additionally, a gun that had been in the top drawer of a desk inside the store was stolen.

Maher Obeid, the owner of Bull Market, testified that he came to the store the morning of the burglary after Ms. Oaks called him. Mr. Obeid explained that there was "glass everywhere" inside the store from the broken drive-thru window and the glass in the front door was cracked. There was damage to two registers inside the store, and one cash register drawer was on the ground outside the drive-thru window. Mr. Obeid stated that money from the cash registers and a gun belonging to him had been stolen. He testified that he had not given anyone permission to be in the store that morning or to take any cash or other items.

---

[3] In his own testimony, the owner of Bull Market explained that the Ruby system register controlled access to the gas tanks and monitored sales of gasoline.

- 6 -

Mr. Obeid testified that he pulled up the video from that morning on the market's security surveillance system. Mr. Obeid explained that, on the video, a person can be seen walking up to the drive-thru window and then walking away. Then a pick-up truck pulled up in front of the store. Someone got out of the truck and walked to the front door with something in their hand. The suspect threw a rock at the front door, but because it was tempered glass, it did not break. The individual then went to the drive-thru window and threw a rock through the glass window. The video showed that the suspect then grabbed the entire cash register, which was sitting just inside the window, and pulled it out onto the ground. Mr. Obeid testified that this caused damage to a credit card machine that had been attached to the cash register. After pulling out the cash register, the suspect crawled through the window and entered the store. The video showed the suspect grabbing the cash drawers from the lottery register and the Ruby register. Mr. Obeid testified that it appeared from the video that the suspect was an African-American male. However, it was impossible to identify the individual because the person was covered from head to toe with clothing.

Mr. Obeid testified about the damages to his store and the cost to replace the items. He explained that it cost $500 to replace the lottery register, $500 for the drive-thru window cash register, and $450 to replace the damaged credit card machine. Mr. Obeid paid a total of $575 to fix the damage to the drive-thru window and front door. He also had to replace the Ruby register, which cost $2,600 plus $1,000 in labor.

Regarding the amount of cash stolen from the registers, Mr. Obeid explained that approximately $3,500 was taken from the lottery register, $200 from the Ruby register, and $200 from the window register. Additionally, "cash drops" which had been kept in the same desk drawer as the gun were taken. Mr. Obeid testified that the cash drops totaled approximately $3,300. Mr. Obeid stated that the gun taken from the desk drawer was valued at $650. He explained that he later recovered the gun from police and was able to identify the gun as his by the serial number. The weapon, once he got it back, was slightly rusty inside and was "pretty dirty."

Investigator David Presley, with the Somerville Police Department, testified that he responded to the burglary call at Bull Market. He observed the scene and then viewed the store's surveillance video. Investigator Presley testified that, from the video, the suspect appeared to be an African-American male of medium complexion. He wore gloves, a hoodie, and had his face partially covered. Investigator Presley noticed that the pick-up truck driven by the suspect had a toolbox mounted on the back, chrome Nerf bars, chrome bedrail bars, and was maroon in color. During the investigation into the burglary, Investigator Presley located the maroon pick-up truck in Haywood County. He testified that the truck had been pulled off of the road about 200 feet and parked in an

area of tall grass near a wooded area. Investigator Presley ran the vehicle's tag number and found that it was reported stolen out of Lauderdale County. Inside the pick-up truck, Investigator Presley noticed that the steering column had been opened and wires were hanging down from the steering column. He found a roll of dimes in the compartment on the passenger side door. He also found a small, cash register key.

Investigator Presley subsequently learned that the Defendant had purchased two vehicles from Mid-City Auto Sales in a short amount of time following the Bull Market burglary. Investigator Presley also discovered that the Defendant had been arrested by another agency and was in the Fayette County Jail. When arrested, the Defendant had on blue pants with white-lined pockets, which appeared to match the pants worn by the burglar at Bull Market.

On cross-examination, Investigator Presley testified that the market had been dusted for fingerprints but investigators were unable to locate any usable prints. Additionally, the inside of the maroon truck was swabbed for DNA, but testing revealed that no DNA profile could be obtained due to "insufficient or degraded DNA."

Special Agent John Sullivan, with the TBI, testified that he became involved in the investigation into the burglary at Bull Market on December 4, 2012, when he interviewed the Defendant's brother, George Grandberry. Agent Sullivan explained that the Defendant lived in George's home in Covington. After George consented to a search of his home, he turned over a pistol to Agent Sullivan, which was later determined to be Mr. Obeid's Ruger P345 semi-automatic pistol. Agent Sullivan also recovered clothing similar to that worn by the Bull Market burglar, including a pair of white K-Swiss tennis shoes, a pair of blue pants, and a black coat. On cross-examination, Agent Sullivan explained that George was wearing the white K-Swiss tennis shoes at the time of the search. Additionally, the pistol had been in a dresser in George's bedroom.

Billy Carroll, a car salesman at Mid-City Auto Sales, testified that on the day of the Bull Market burglary, the Defendant came to the car lot to buy a vehicle. Mr. Carroll sold the Defendant a blue, 1996 Chevrolet pick-up truck. Mr. Carroll explained that the Defendant did not provide any type of employer information on his credit application and the Defendant paid a $500 down payment in cash. Mr. Carroll recalled that the Defendant returned to the car lot a few weeks later and bought a blue Chevrolet Tahoe. The Defendant bought the Tahoe outright—paying $3,300 in cash.

George Grandberry, the Defendant's brother, testified that the Defendant came to live with him in September 2012. George explained that, one night after the Defendant's arrest, he was raking leaves when he found a handgun in his front yard. The gun was by the house near the Defendant's bedroom window behind some shrubs. George recalled

that the gun looked like it had been sitting in the yard for a while and had some rust on it. He decided to keep the weapon and took it into the house. When he was later questioned by police, George allowed officers to search his residence. Investigators asked if the Defendant brought any weapons into the house, and George told them about the gun he found in the yard. He turned the gun over to police, as well as the Defendant's white K-Swiss tennis shoes. Officers also seized a pair of pants and a black jacket from the Defendant's bedroom. George recalled that the Defendant purchased a pick-up truck and then a Tahoe "pretty close to the time he got arrested." The Defendant, however, did not have a job, and George would occasionally give the Defendant money for food and cigarettes.

Rolando Horne testified that he lived with the Defendant's sister in Haywood County. Mr. Horne recalled that, one morning in November 2012, the Defendant came to his apartment at around 9:00 a.m. or 10:00 a.m. The Defendant asked Mr. Horne to follow him so the Defendant could drop off a maroon truck. Mr. Horne testified that the Defendant drove the truck about a mile and a half and then pulled into a field. Mr. Horne identified the truck as the maroon truck found by Agent Sullivan and stated that he had never seen the Defendant with the truck before that day. Mr. Horne recalled that, around 1:00 p.m. the same day, he accompanied the Defendant to Mid-City Auto Sales where the Defendant purchased a blue truck. Upon returning to Mr. Horne's apartment, Mr. Horne and the Defendant were playing video games when Mr. Horne saw the handle of a silver and black handgun sticking out of the Defendant's clothing. Later, at the Defendant's brother's home, the Defendant was showing off the gun but did not tell Mr. Horne where he got it.

Anthony Grandberry, the Defendant's cousin, testified that, while serving a federal sentence for an unrelated crime, he was housed in the Fayette County Jail at the same time as the Defendant. Anthony stated that, over the course of two months, the Defendant spoke to him about the instant case. The Defendant told Anthony that he had broken into Bull Market, "stole a cash register and took a gun." The Defendant said that he took the stolen gun to his brother's house and "put it in the yard." The Defendant also made threats to kill his sister, brother, and brother-in-law. After hearing the threats, Anthony contacted the TBI and spoke to Agent Sullivan about the Defendant's comments.

In addition to witness testimony, the parties stipulated that the Defendant was a convicted felon on November 17, 2012. At the conclusion of proof, the jury found the Defendant guilty of burglary, theft over $10,000, vandalism over $1,000, and felon in possession of a handgun.

## II. Analysis

### A. Restraining the Defendant at Trial

The Defendant contends that the trial court abused its discretion when it ordered that he be shackled during trial. The Defendant asserts that these were "not the least restrictive means" of ensuring courtroom security and that the restraints may have been noticed by members of the jury as the Defendant could not stand or move his hands above counsel table. Moreover, the Defendant claims that, during voir dire, the jury pool saw that he was shackled and handcuffed and the trial court provided no instruction to the jury regarding the restraints. The State responds that the trial court properly exercised its discretion when it ordered the Defendant to be restrained during trial. We agree with the State.

The United States Supreme Court has explained that, because the use of physical restraints on defendants during trial is "an affront to the very dignity and decorum of judicial proceedings," restraints such as shackles may only be used as "a last resort." Illinois v. Allen, 397 U.S. 337, 344 (1970). In Tennessee, our courts have held that there is a legal presumption against the use of visible restraints in court that flows from due process guarantees to a fair trial. Mobley v. State, 397 S.W.3d 70, 99 (Tenn. 2013) (citing Willocks v. State, 546 S.W.2d 819 (Tenn. Crim. App. 1976)). Additionally, the use of shackles during a trial has been specifically condemned absent certain safeguards designed to assure that the shackles do not influence the issue of innocence or guilt. State v. Hall, 461 S.W.3d 469, 497 (Tenn. 2015) (citing State v. Smith, 639 S.W.2d 677, 681 (Tenn. Crim. App. 1982)), petition for cert. filed (June 22, 2015). Tennessee law, consistent with federal precedent, affords discretion to the trial court with respect to the decision to employ shackles, but the State bears the burden of demonstrating necessity. Mobley, 397 S.W.3d at 99 (citing Willocks, 546 S.W.2d at 821-22). Preventing the escape of the defendant, protecting individuals in the courtroom, and maintaining order during trial have all been recognized as reasons supporting the use of shackles on a defendant. Id. (citing State v. Thompson, 832 S.W.2d 577, 580 (Tenn. Crim. App. 1991); Willocks, 546 S.W.2d at 820.)

Regarding a trial court's decision to employ shackles to restrain a defendant, our supreme court has stated:

> When requiring shackles, the trial court must place findings of necessity on the record. In fact, the better practice is to hold a hearing so that factual disputes may be resolved and evidence concerning the use of shackles may be placed in the record. The trial court must employ the least drastic security measure necessary to accomplish the objective. Lastly, in

the event the defendant is shackled in view of the jury, the trial court must give a cautionary instruction that the shackling should not influence the jury's decision.

Mobley, 397 S.W.3d at 99 (citations omitted).

A trial court should consider all relevant circumstances, including, but not limited to: "(1) the defendant's circumstances, such as record of past behavior, temperament, and the desperateness of his or her situation; (2) the state of the courtroom and courthouse; (3) the defendant's physical condition; and (4) whether there is a less onerous but adequate means of providing security." Id. at 101 (citing Lakin v. Stine, 431 F.3d 959, 964 (6th Cir. 2005); Kennedy v. Cardwell, 487 F.2d 101, 110-11 (6th Cir. 1973)). Additionally, a trial court should "consider the relevant circumstances against the backdrop of affording the defendant the physical indicia of innocence, ensuring the defendant's ability to communicate with counsel, protecting the defendant's ability to participate in his or her defense and offer testimony in his or her own behalf, and maintaining a dignified judicial process." Id.

In this case, the trial court conducted an extensive, two-day hearing on the issue of the need to restrain the Defendant at trial during which the court heard unrebutted proof from the State that established the necessity of shackling the Defendant. The trial court made specific factual findings regarding the necessity of shackling. Relying upon the Defendant's history of assaults on jail staff and inmates, threatening and disruptive behavior, possessing prison shanks, and escape attempts, the trial court found that the Defendant was a "dangerous person" and posed a threat during trial to court personnel, defense counsel, the court, and the jury. Additionally, the trial court considered whether the use of shackles was the least drastic security measure necessary and found that it was. Lastly, the trial court ensured that the Defendant's shackles were not visible to the jury by placing a curtain around the bottom of counsel table. As such, no cautionary instruction to the jury that the Defendant's shackling should not influence its decision was needed. Although the Defendant claims that the jury pool could see his handcuffs during voir dire, the trial court specifically rejected this contention at the motion for new trial hearing, stating that "at no time was the Court nor any of the parties . . . made aware that the jury may have seen those cuffs, so that was not a factor during the trial." For these reasons, we conclude that the trial court acted within its discretion in ordering the Defendant to be shackled during trial. The Defendant is not entitled to relief.

### B. Sufficiency of the Evidence

The applicable standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the Appellant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

In a jury trial, the weight and credibility given to the testimony of witnesses, as well as the reconciliation of conflicts in that testimony, are questions of fact best determined by the jury, because they saw and heard the witnesses, and by the trial judge, who concurred in and approved the verdict. Bland, 958 S.W.2d at 659. This court will not reweigh the evidence. Id. On review, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

As charged in the Defendant's indictment, a person commits burglary who, without the effective consent of the property owner, enters a building other than a habitation not open to the public, with the intent to commit a felony, theft, or assault. See Tenn. Code Ann. § 39-14-402(a)(1) (2012). A person commits theft of property if, "with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a) (2012). Any person who knowingly causes damage to or the destruction of any real or personal property of another without the owner's effective consent is guilty of vandalism. See Tenn. Code Ann. § 39-14-408(a) (2012). Acts of vandalism are to be valued according to the provisions of Tennessee Code Annotated section 39-11-106(a)(36) and punished as theft under section 39-14-105. Tenn. Code Ann. § 39-14-408(c) (2012). Regarding the Defendant's conviction for being a felon in possession of a handgun, the State had to prove beyond a reasonable doubt that the Defendant possessed the handgun and had been convicted of a felony. Tenn. Code Ann. § 39-17-1307(c)(1) (2012).

On appeal, the Defendant makes no specific argument as to why the evidence is insufficient except to assert that there was "no direct evidence of his participation [in the burglary and theft]." At trial, however, the focus of the Defendant's argument was on the inability of the State's witnesses to identify him as the individual captured on the market's video surveillance system.

The identity of the perpetrator is "an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." Id. (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

In this case, the evidence viewed in the light most favorable to the State supports the jury's conclusion that the Defendant was the perpetrator captured on video surveillance burglarizing Bull Market. Mere hours after the burglary, the Defendant asked Mr. Horne to accompany him as the Defendant got rid of a maroon truck identical to the maroon truck driven by the perpetrator of the offense. Mr. Horne testified that, later the same day, the Defendant was showing off a black and silver handgun, which was the same type of gun stolen in the burglary. Moreover, following the burglary, the Defendant purchased two new vehicles from Mid-City Auto Sales. The Defendant, who did not have a job, paid a $500 cash down payment on the blue pick-up truck and $3,300 in cash for the Tahoe. The Defendant told Anthony that he committed the burglary and put the stolen gun in his yard. The Defendant's jailhouse confession was corroborated by the Defendant's brother, who found the stolen weapon in the front yard of the house he shared with the Defendant. Thus, we conclude that the evidence clearly supports the jury's finding that the Defendant was the individual seen in the video burglarizing Bull Market.

Regarding the offenses of theft and vandalism, the video evidence shows that the Defendant broke into the store through the glass drive-thru window and then began ransacking the store in an apparent attempt to locate cash and valuables. Mr. Obeid testified that the Defendant stole a handgun, parts of cash registers, and cash totaling over $10,000. Additionally, Mr. Obeid detailed the damage caused by the Defendant, and the costs associated with repairing and replacing the damaged items well exceeded $1,000. As to the felon in possession of a firearm conviction, the Defendant stipulated that, on the day of the instant offenses, he was a convicted felon. The State also established that the Defendant was in possession of a handgun the same day through the testimony of Mr. Horne and Anthony, as well as the video surveillance tape from Bull Market that showed Mr. Obeid's gun in the Defendant's hand as he exited the store through the broken window.

Accordingly we conclude that the evidence is sufficient to support the jury's finding the Defendant guilty beyond a reasonable doubt of burglary, theft over $10,000, vandalism over $1,000, and being a felon in possession of a handgun. The Defendant is not entitled to relief.

### III. Conclusion

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE